Justice Brown delivered the opinion of the Court.
*574 The Texas Constitution requires that taxation "shall be equal and uniform" and that property "shall be taxed in proportion to its value." The Galveston County appraisal district argues that a statutory formula determining the taxable value of leased natural-gas compressors located in its jurisdiction violates these constitutional provisions because this formula values the compressors at a "minute fraction" of their market value. The parties further disagree on which county-Galveston or Washington-may tax the compressors. We hold that the county has failed to rebut the presumed constitutionality of the statutes at issue and that Washington County is the taxable situs for the compressors. As the court of appeals held otherwise, we reverse its judgment.
I
EXLP Leasing, LLC, and EES Leasing, LLC (collectively, "EXLP") are wholly owned subsidiaries of Exterran Holdings, Inc. EXLP owns and leases out compressor stations used to deliver natural gas into pipelines. Some of these compressors are in use in Galveston County.
The county traditionally taxed the compressors in its jurisdiction as business-personal property based on their full market value. But the legislature overrode that practice in 2012 when it added leased heavy equipment to a statutory formula used to appraise the value of heavy equipment held by dealers for sale. Act of May 21, 2011, 82d Leg., R.S., ch. 322, 2011 Tex. Gen. Laws 938, 938-41. Accordingly, state law now requires appraisal based on the lease revenue the compressors generated during the previous tax year divided by twelve. See TEX. TAX CODE § 23.1241(b).
EXLP contends the legislature intended to fix a problem that arose when the same equipment was leased multiple times within one year, with each lease counting as an individual sale for tax purposes. See Briggs Equip. Tr. v. Harris Cty. Appraisal Dist. , 294 S.W.3d 667, 672 (Tex. App.-Houston [1st Dist.] 2009, pet. denied) (holding that "successive leases" cannot be " 'subsequent sales' " because "they are not 'dealer-financed sales' " as defined by the tax code). The new divide-revenue-by-twelve formula would simplify the appraisal process while providing an "offsetting gain" for the tax revenue lost to the fix. See Fiscal Note, Tex. H.B. 2476, 82d Leg., R.S. (2011). But the county claims the anticipated offset *575 never materialized because lawmakers proceeded on the erroneous assumption that counties were not already taxing leased heavy equipment at full market value. As a result, a statutory change "intended to produce a slight gain in tax revenue or remain neutral has actually resulted in a 97% loss in [compressor-based] tax revenue" for Galveston County.
EXLP and the county are also at odds over where the compressors may be taxed in light of the 2012 tax-code amendments. After the amendments were enacted, EXLP took the position that its compressors in Galveston County are taxable only in Washington County, where EXLP maintains a business address and storage yard. The county disagreed. In a letter to all dealers with heavy equipment leased in its jurisdiction, the county announced it would appraise leased heavy equipment under the tax-code provision generally covering business-personal property, see TEX. TAX CODE § 22.01, declaring that "[r]ecent litigation has determined that the valuation of leased heavy equipment under Section 23.1241 of the Texas Property Tax Code is unconstitutional."
EXLP sued for judicial review pursuant to tax code sections 42.10 and 42.21. Both sides moved for summary judgment. The county argued that: (1) the tax-code provisions at issue are unconstitutional as applied to EXLP's compressors in Galveston County; (2) EXLP's compressors are not actually "heavy equipment" under the tax code, and therefore the disputed statute is inapplicable; and (3) Galveston County is the taxable situs for the compressors at issue. EXLP urged the trial court to rule that: (1) the legislature validly exercised its power to prescribe a method for appraising the value of its compressors; (2) its compressors are "heavy equipment" as defined by the tax code; and (3) Washington County is the proper taxable situs. The trial court granted the county's motion in part, declaring that EXLP's compressors are heavy equipment under the tax code, but that tax code sections 23.1241 and 23.1242 are unconstitutional as applied to those compressors. The trial court also declared Galveston County the compressors' taxable situs.
EXLP appealed.[1] The court of appeals reversed in part, holding that "[n]either side produced summary[-]judgment evidence demonstrating, as a matter of law, that the method of appraising compression unit rental inventories embodied in sections 23.1241 and 23.1242 of the Tax Code is either a reasonable or unreasonable method of calculating their reasonable market value." 475 S.W.3d 421, 428 (Tex. App.-Houston [14th Dist.] 2015). The case was remanded "for further proceedings on the constitutionality of sections 23.1241 and 23.1242 as applied to the compression unit rental inventories at issue." Id. at 429. But the court of appeals affirmed the trial court's declaration of Galveston County as the taxable situs of EXLP's compressors, holding that tax code section 23.1241(f)"does not create a specific situs rule for [EXLP's] inventory" and that "its situs is determined under the general rule of section 21.02." Id. at 430. Both parties sought our review.
II
"There is always a presumption of constitutional validity with regard to legislation and it is especially strong in respect to statutes relating to taxation." In re Nestle USA, Inc. , 387 S.W.3d 610, 623 (Tex. 2012) (quoting Vinson v. Burgess , 773 S.W.2d 263, 266 (Tex. 1989) ). Courts *576 presume that the Legislature "understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds." Enron Corp. v. Spring Indep. Sch. Dist. , 922 S.W.2d 931, 934 (Tex. 1996) (quoting Smith v. Davis , 426 S.W.2d 827, 831 (Tex. 1968) ). The party challenging the statute's constitutionality bears the burden of demonstrating that the enactment fails to meet constitutional requirements. Spring Branch Indep. Sch. Dist. v. Stamos , 695 S.W.2d 556, 558 (Tex. 1985).
A
The Texas Constitution provides that "[t]axation shall be equal and uniform." TEX. CONST. art. VIII, § 1 (a). We have held that the constitutional provisions that follow this directive are examples of equal and uniform taxation, see Nestle , 387 S.W.3d at 620, including the requirement that "real property ... shall be taxed in proportion to its value, which shall be ascertained as may be provided by law" but "never at a greater value than its fair market cash value." TEX. CONST. art. VIII, §§ 1 (b), 20. Accordingly, a property tax is equal and uniform "only if it is in proportion to property value." Nestle , 387 S.W.3d at 620.
The county argues that for constitutional purposes, "value" under article VIII, section 1(b) means the actual market value a willing buyer would pay a willing seller for the compressors at issue. Cf. TEX. TAX CODE § 1.04(7) (defining "market value" as "the price at which a property would transfer for cash or its equivalent under prevailing market conditions"); City of Harlingen v. Estate of Sharboneau , 48 S.W.3d 177, 187 (Tex. 2001) ("Market value is the price the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying." (internal quotation marks omitted)). The county contends the legislature's chosen approach for dealer-held leased heavy equipment, however, values the compressors for tax purposes at "a minute fraction" of their market value.
Nothing in the constitution, however, binds the legislature to tax only on "market value" as so defined. The constitution refers only to the legislature's authority to set the "value" of property for taxation. See TEX. CONST. art. VIII, § 1 (b). It sets no requirement that "value" must approximate "market value." In fact, section 1(b) does not mention "market value" at all. Instead, the constitution assigns to the legislature the task of determining "value," providing that it "shall be ascertained as may be provided by law." Id. This provision "would seem to leave the Legislature free to adopt the mode of ascertaining the value of any class of property by such method as it might deem best." Mo., K. & T. Ry. Co. of Tex. v. Shannon , 100 Tex. 379, 100 S.W. 138, 144 (1907) ; see also Republic Ins. Co. v. Highland Park Indep. Sch. Dist. , 129 Tex. 55, 102 S.W.2d 184, 193 (1937) (observing that "the fixing of a standard of valuation" is "purely of the exercise of discretion and judgment on the part of the Legislature").
To read "market value" into the constitution would both add a word the drafters omitted and reduce legislative discretion to a purely ministerial duty. If "value" must always mean "market value," what is left for the legislature to "ascertain[ ]" and "provide[ ] by law"? See TEX. CONST. art. VIII, § 1 (b). Plainly, it is the legislature's province under the constitution to decide how property should be valued for taxation. In doing so, the legislature is not tethered to an extra-textual *577 valuation methodology that would dictate a particular outcome.
But the county argues our case law acknowledges "market value" as the appropriate constitutional benchmark. See, e.g. , Enron , 922 S.W.2d at 935 ("We have further held that section 1 of article VIII of our Constitution requires 'value' for ad valorem purposes to be based on the reasonable market value of the property."); State v. Whittenburg , 153 Tex. 205, 265 S.W.2d 569, 572 (1954) (noting that courts "have interpreted [ article VIII, section 1 and a statute providing that 'real property shall be valued at its true and full value in money'] to mean that assessed valuations shall be based on the reasonable cash market value of property" (internal quotation marks omitted)); Lively v. Mo., K. & T. Ry. of Tex. , 102 Tex. 545, 120 S.W. 852, 856 (Tex. 1909) ("The value of the property is to be determined by what it can be bought and sold for.") (quoting New York State v. Barker , 179 U.S. 279, 285, 21 S.Ct. 121, 45 L.Ed. 190 (1900) ). The county further contends this interpretation has been "codified" in the tax code; indeed, the valuation statute challenged here itself purports to determine the "market value" of dealer-held leased heavy equipment. See TEX. TAX CODE § 23.1241(b) - (c).
If our case law contradicts the constitution's plain text, our case law is wrong. But we do not believe any of our decisions warrant the conclusion that "value" must be constitutionally attached to "market value." And while many of the tax code's valuation methodologies are based on market value, the code also provides for alternative valuation methods in some circumstances. In any event, the legislature's reliance on market valuation for the vast majority of property does not create a constitutional imperative that it do so in all instances.
We first address the tax code and then discuss our case law.
B
Without question, the tax code is built on the foundation of taxing property at market value. It provides that "all taxable property is appraised according to its market value," which "shall be determined by the application of generally accepted appraisal methods and techniques." Id. § 23.01(a)-(b). Accepted appraisal methods include the "cost method," see id. § 23.011, the "income method," see id. § 23.012, and the "market data comparison method," see id. § 23.013.
So at the outset, the tax code provides that taxation should generally be based on "market value" but immediately clarifies that "market value" can mean different things depending on the applicable "accepted appraisal method." The code then supplements these baseline valuation methods with a bevy of "special appraisal provisions"-an entire subchapter's worth-establishing different valuation rules and formulas for discrete categories of property. See id. §§ 23.11-.26. The challenged statute in this case is among them. It is one of seven statutes that value certain classifications of property through a formula-based approach that bases value on a portion of income-clearly a departure from the "generally accepted appraisal methods." Four of them- sections 23.121, 23.124, 23.1241, and 23.127 -calculate "market value" based on the same concept: dividing annual revenue by twelve to reach a monthly income average. Yet in each instance, the applicable statute continues to refer to "market value" when describing the number the formula is intended to produce.
Viewing tax code chapter 23 as a whole, the legislature clearly chose a single label-"market value"-as a catch-all reference *578 to the taxable value produced through application of the code's rules. Exactly what "market value" means for taxation purposes depends on the circumstances at hand and the rules the legislature prescribed for them. The tax code has not "codified" a single understanding of market value as the price a willing buyer would pay a willing seller. Rather, the term encompasses a variety of ways to determine taxable value. See Tarrant Appraisal Dist. v. Colonial Country Club , 767 S.W.2d 230, 234 (Tex. App.-Fort Worth 1989, writ denied) ("One should not lose sight of the fact that the valuation is used only for purposes of taxation.... What would occur in an actual sale would have no bearing on the proper valuation for tax purposes."). Importantly, section 23.1241 provides that "[f]or the purpose of the computation of property tax , the market value of a dealer's heavy equipment inventory on January 1 is...." TEX. TAX CODE § 23.1241(b).
Regardless of how the term "market value" is used in the tax code, the legislature cannot legislate itself a constitutional imperative. The constitution does not compel market-value-based valuation. That fact does not change simply because the legislature has enacted a tax code built on "market value" terminology.
C
When speaking broadly about article VIII, section 1(b), we have observed that the provision "would seem to leave the Legislature free to adopt the mode of ascertaining the value of any class of property by such method as it might deem best." Shannon , 100 S.W. at 144. For instance, we have considered a constitutional challenge to a statute that allowed an insurance company to deduct its reserves from the valuation of its personal property when computing its property taxes. Republic Ins. , 102 S.W.2d at 193. We concluded that "the question is not one primarily of exemption of property from taxation, but is the fixing of a standard of valuation of personal property for taxation," which we held was "purely of the exercise of discretion and judgment on the part of the Legislature." Id. And when this resulted in an insurance company's paying no taxes on personal property at all, we cited article VIII, section 1, and held that "[t]he Legislature has simply provided that in arriving at the valuation of assets of an insurance company, account must be given to the reserve." Hardin v. Cent. Am. Life Ins. Co. , 374 S.W.2d 881, 884 (Tex. 1964).
But the county has scoured our case law and presented examples in which we referred to "reasonable market value" when considering the constitution's "value" provision. Still, none of these cases turned on whether "value" in article VIII, section 1(b), means "market value." Nor did any examine the constitutional text as part of resolving a dispute about that text.
Two cases on which the county relies involved disparate local taxation. In Lively v. Missouri, K. & T. Railroad Co. , some property was taxed by local authorities at 100% of its market value while other property was taxed at 66%. 120 S.W. at 856. In Whelan v. State , some property was taxed at a flat rate, regardless of market value. 155 Tex. 14, 282 S.W.2d 378, 380 (1955). Both schemes were then, and are today, examples of unequal and non-uniform taxation. See Enron, 922 S.W.2d at 935 (discussing Whelan and Lively and noting the local taxing authorities' actions were "clearly contrary to the constraints placed on the taxing authority by section 1"). But the county argues these cases stand for a constitutional requirement that valuation always be based on market value. We disagree.
*579 Again, in neither of these cases did we directly construe article VIII, section 1(b). Nor was the constitutionality of any statute challenged. In Lively and Whelan , it was the actions of local taxing authorities that contravened state statutes and the constitution. And for the property at issue, the law called for taxation at market value, and the constitution required it to be equal and uniform. See Whelan , 282 S.W.2d at 380 ; Lively , 120 S.W. at 856-57. The local taxing authorities' unilateral actions violated both mandates. Neither case stands for the principle that all valuation statutes themselves must be based on willing-buyer-willing-seller market value.
The county also directs us to State v. Whittenburg , in which we enforced a market-value-based approach to property valuation for tax purposes. 265 S.W.2d at 572. But in that case, willing-buyer-willing-seller market value was a statutory requirement. Id. (citing a statute directing that "real property shall be valued at its true and full value in money"). So we held fast to willing-buyer-willing-seller market value because that was the valuation method the legislature prescribed for the property at issue.
The parties reserve most of their wrangling for Enron v. Spring ISD , in which the county reminds us that we said "our Constitution requires 'value' for ad valorem tax purposes to be based on the reasonable market value of the property." 922 S.W.2d at 935. Enron , however, was not a case construing constitutional "value," nor was there any dispute in that case whether valuation of the property at issue was market-value based. Moreover, this statement preceded a brief explanation of the constitutional error in Whelan , a case not directly applicable here for the reasons explained above. EXLP, on the other hand, directs us to our holding that the legislature "may constitutionally draw distinctions in the manner in which market value of property is determined for ad valorem purposes, so long as the classifications are not unreasonable, arbitrary, or capricious." Id. at 936. In singling out heavy equipment held by dealers for lease, EXLP argues, the legislature reasonably drew such a distinction.
Enron concerned a constitutional challenge to a statute that allowed Enron to choose between two dates for tax appraisal of its natural-gas inventory. Id. at 933. Either way, Enron would be taxed on the market value of its natural-gas inventory as of that date. Id. Accordingly, no issue existed as to whether the formula would generate a number approximating "market value." Instead, the issue was whether it was fair to allow Enron-but not other taxpayers-to choose the day on which its property would be valued. Id. at 933-34.
We upheld the statute, observing that on either date Enron's natural-gas inventory was appraised at its market value, as was statutorily required. Id. at 939. We likewise noted that the legislature could reasonably conclude that "storage of natural gas for the needs of the citizens of this state should not be discouraged or penalized by a taxation scheme," and that the challenged provision may reflect a "desire to promote assessments on a value that is more reflective of true market value." Id. In other words, the legislature treated taxpayers differently, but acted rationally-and therefore constitutionally-in doing so. See ids="10022761" index="51" url="https://cite.case.law/sw2d/922/931/#p934">id. ("We cannot say that th[is] method for valuing inventory ... is so arbitrary and unreasonable that it is unconstitutional.").
EXLP contends the legislature's decision to value leased heavy equipment based on income produced rather than willing-buyer-willing-seller market value is a permissible classification appropriate for dealer-held inventory. The county urges, *580 however, that the valuation formula here is too divorced from actual market value to pass constitutional muster.[2] In other words, even if Enron allowed distinctions in treatment between taxpayers, the taxation itself must still be based on reasonable market value. Allowing for a "reasonable discrepancy between the true value of the property and the value at which it is assessed for taxes" due to "difference in judgment," see Dall. Cty. v. Dall. Nat'l Bank , 142 Tex. 439, 179 S.W.2d 288, 289 (1944), the county contends that the statute's requirement that compressors be "valued at a maximum of one-month's rent" is "unreasonable, arbitrary, [and] capricious."
The entirety of the county's argument against section 23.1241 is that it impermissibly ignores the compressors' actual market value; the county offers no additional arguments for why the scheme is otherwise unreasonable, arbitrary, or capricious. But no one argues the legislature attempted to approximate market value, and we hold it is not constitutionally bound to do so. The county's complaint that the outcome is unfair-the compressors are taxed at a "minute fraction" of their market value and the county has lost revenue-is a concern beyond our purview. Even if the policy is inadvisable, we "decline to usurp legislative authority by issuing reform diktats from on high, supplanting lawmakers' policy wisdom with our own." Morath v. Tex. Taxpayer & Student Fairness Coal. , 490 S.W.3d 826, 886 (Tex. 2016).
EXLP mounts a vigorous defense of sections 23.1241 and 23.1242 as an efficient and equitable statutory scheme, but we need not consider it. "The burden is on the party attacking the statute to show that it is unconstitutional." Tex. Mun. League Intergov'tl Risk Pool v. Tex. Workers' Comp. Comm'n , 74 S.W.3d 377, 381 (Tex. 2002). The county made its stand on the idea that the constitution compels a market-value approach to taxing the compressors at issue. Because it offers no other reason why the statute is unconstitutional, the presumption favoring constitutionality prevails. See Nestle , 387 S.W.3d at 623 ; see also Regan v. Taxation with Representation of Wash. , 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ("[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.") (quoting Madden v. Kentucky , 309 U.S. 83, 87-88, 60 S.Ct. 406, 84 L.Ed. 590 (1940) ).
D
The county also briefly argues section 23.1241 violates the constitution's "equal and uniform" provision because other compressors-those owned rather than leased by their users-are still taxed based on their market value. This "grossly disparate treatment," the county contends, is "fundamentally inequitable and inherently unconstitutional."
Indeed, the legislature has, for tax purposes, classified leased heavy equipment owned by dealers differently from heavy equipment owned by its ultimate users-a policy decision of which the county clearly disapproves. But we held in Enron that the legislature may "constitutionally draw distinctions ... so long as the classifications are not unreasonable, arbitrary, or capricious." 922 S.W.2d at 936. And the constitution's equal-and-uniform mandate "generally applies only within classes, not between classes."
*581 Hegar v. Tex. Small Tobacco Coal. , 496 S.W.3d 778, 785 (Tex. 2016) ; see also EXLP Leasing, LLC v. Ward Cty. Appraisal Dist. , 476 S.W.3d 752, 767 (Tex. App.-El Paso 2015, pet. filed) ("The constitutional mandate of equality and uniformity requires only that persons falling within the same class be taxed alike."). Those who own compressors for their own use and those who own them to lease out are both compressor owners, but they are in different tax classes. The county makes no argument why this classification is impermissible. Instead, it summarily declares that the legislature's method for assigning market value is unreasonable, arbitrary, and capricious. As the county's argument provides us nothing to analyze, it fails.
E
The court of appeals correctly reversed the trial court's judgment, but it erred when it remanded the case for further proceedings on the basis that "[n]either side produced summary[-] judgment evidence demonstrating, as a matter of law," that the appraisal statutes at issue here constitute a "reasonable or unreasonable method of calculating [the compressors'] reasonable market value." 475 S.W.3d at 428. The court of appeals noted the county's evidence that the legislature's chosen appraisal method "reduced the appraised value of individual compression units, sometimes to zero if a unit was not leased at all during that year." Id. at 427. But, the court concluded, the county did not furnish any evidence that such a result is arbitrary, capricious, or unreasonable. Id.
We agree that the county has not carried its burden to rebut the presumed constitutionality of the appraisal statutes at issue, but remanding for more factual development is not the answer. However phrased, the county's arguments can be reduced to its belief that the legislature may not constitutionally appraise leased heavy equipment on a basis other than market value. But the legislature is not so confined. The question, therefore, is not whether the legislature's chosen approach reasonably or unreasonably calculates market value. Nor is it whether the legislature's decision to classify dealers of leased heavy equipment separately for tax purposes is or is not reasonable. Again, the county makes no argument against the classification outside its contention that the scheme is "unreasonable, arbitrary, or capricious" because it is not market-value-based.
The question here is one of law.[3] It does not require the development of contingent facts. The county did not carry its burden to rebut presumed constitutionality. Indeed, it had no hope of doing so because the basis on which it proceeded-that the legislature must employ methodology that approximates actual market value-finds no support in either the plain text of the constitution or in our precedent. The trial court erred by holding the valuation statutes unconstitutional. And the court of appeals erred by not reversing the trial court's judgment and rendering judgment that the county failed to rebut the presumed constitutionality of sections 23.1241 and 23.1242.
III
In its second issue, EXLP argues the court of appeals erroneously held that *582 Galveston County is the taxable situs of EXLP's compressors located there. The legislature's 2012 tax-code amendments, EXLP argues, provide that taxes should be paid in the county where it conducts business-Washington County-based on the revenue generated by its inventory as a whole and regardless of the physical location of individual leased units. In moving for summary judgment on this issue, EXLP offered evidence that the compressors located in Galveston County are part of its Gulf Coast Region fleet, which EXLP leases and services out of its Washington County storage yard and office.
Galveston County notes, however, that the statute on which EXLP relies nowhere mentions taxable situs. Rather, the county argues, chapter 21 of the tax code determines situs. See TEX. TAX CODE § 21.02. Section 21.02 provides that "tangible personal property is taxable by a taxing unit if," among other scenarios, "it is located in the unit on January 1 for more than a temporary period." Id. § 21.02(a)(1). The county maintains that EXLP's compressors in Galveston County are semi-permanent installations that often remain in place for years, and so they certainly should qualify under section 21.02. EXLP responds that although the heavy-equipment inventory statutes at issue never employ the phrase "taxable situs," the statutory framework they create necessitates taxation of an entire inventory in the county where the dealer conducts business.
In construing statutes our primary objective is to effectuate the legislature's intent. See City of Houston v. Bates , 406 S.W.3d 539, 543 (Tex. 2013). "Legislative intent is best expressed by the plain meaning of the text unless the plain meaning leads to absurd results or a different meaning is supplied by legislative definition or is apparent from the context." Id. (citing Tex. Lottery Comm'n v. First State Bank of DeQueen , 325 S.W.3d 628, 635 (Tex. 2010) ). In ascertaining legislative intent, we read the entire statute as a whole and do not consider isolated sections, provisions, or terms in a vacuum. See City of San Antonio v. City of Boerne , 111 S.W.3d 22, 25 (Tex. 2003).
Chapter 21 of the tax code is titled "Taxable Situs" and includes various provisions controlling the determination of where property may be properly taxed. See TEX. TAX CODE §§ 21.01 -.10. Section 21.02 applies to "[t]angible [p]ersonal [p]roperty [g]enerally ... [e]xcept as provided by Subsections (b) and (e) and by Sections 21.021, 21.04, and 21.05." Id. § 21.02(a). Section 21.02, the county argues, speaks definitively and provides for limited exceptions to its applicability, none of which apply here.
EXLP's situs argument, on the other hand, is based entirely on chapter 23, which is titled "Appraisal Methods and Procedures" and includes the previously discussed provisions addressing taxation of heavy equipment held by dealers for sale or lease. Sections 23.1241 and 23.1242 do not specifically mention taxable situs. But EXLP contends a process for inventory reporting and prepayment of taxes on a dealer's entire inventory to a single county establishes a scheme that supplants the default rules found in chapter 21.
In considering the implications of sections 23.1241 and 23.1242 for taxable situs of dealer-held heavy equipment, we "consider the statute[s] as a whole and construe [them] in a manner which harmonizes all of [their] various provisions." Lamar Homes, Inc. v. Mid-Continent Cas. Co. , 242 S.W.3d 1, 19 (Tex. 2007). Chapter 21 addresses taxable situs by name; sections 23.1241 and 23.1242 do not. But the omission of "taxable situs" as a term of art in those sections does not mean they say nothing on the subject. If, instead, they *583 create a statutory framework specific to dealer-held heavy equipment that assumes or necessitates a taxable-situs rule different from section 21.02, we may ascertain legislative intent for a rule specific to the circumstances at hand that overcomes the general situs rules separately found in chapter 21. In that case, "the specific provision will ordinarily prevail unless the general provision is the later enactment and the manifest intent is that the general provision prevail." Harris Cty. Appraisal Dist. v. Tex. Workforce Comm'n , 519 S.W.3d 113, 122 (Tex. 2017).
We conclude that sections 23.1241 and 23.1242, read together, reflect the legislature's intent to fix the situs of dealer-held heavy equipment at the location where the dealer maintains its inventory, rather than at the various locations where the equipment might otherwise be physically located through application of the default situs rules set forth in chapter 21. This framework, which we explain in greater detail below, cannot function if chapter 21's provisions still determine taxable situs.
The framework for valuation of dealer-held heavy equipment established in section 23.1241 ignores the physical location of any particular unit of inventory on any particular date. Instead, section 23.1241(b) provides that the value of a dealer's heavy-equipment inventory is determined by the annual income generated by the inventory as a whole, rather than the income from each individual unit of equipment. See TEX. TAX CODE § 23.1241(b) ("For the purpose of the computation of property tax, the market value of a dealer's heavy equipment inventory on January 1 is the total annual sales [defined elsewhere to include lease revenue] ... for the 12-month period corresponding to the preceding tax year, divided by 12." (emphasis added)). A "[d]ealer's heavy equipment inventory" is statutorily defined as "all items of heavy equipment that a dealer holds for sale, lease, or rent in this state during a 12-month period." Id. § 23.1241(a)(2) (emphasis added). Similarly, "[t]otal annual sales" includes "lease and rental payments for each lease or rental of heavy equipment inventory in a 12-month period." Id. § 23.1241(a)(9)(B).
Broadly speaking, section 23.1241 looks to inventory-wide revenue. The revenue generated by individual units, wherever they may be, is relevant only in that it produces part of the data fed into the valuation formula that produces an aggregate taxable valuation on "all items of heavy equipment ... in this state." See id. § 23.1241(a)(2). Section 23.1241 includes no process for tracking individual units or documenting the revenue they produce while located in any given county on any particular date.
Section 23.1241 further requires dealers to value their inventory and file an annual declaration "with the chief appraiser" and "collector" containing "a statement that the declarant is the owner of a dealer's heavy equipment" and stating "the market value of the declarant's heavy equipment inventory for the current tax year as computed under [ section 23.1241(b) ]." Id. § 23.1241(f)(2)-(3). The dealer's annual declaration is a precursor to the statutorily required monthly prepayment of anticipated property taxes due on that inventory to the local taxing jurisdictions. This process is outlined in section 23.1242, titled "Prepayment of Taxes by Heavy Equipment Dealers."
The process for prepayment of taxes indicates legislative intent to fix the tax situs for heavy equipment at the business location where the dealer maintains its inventory, not the myriad locations where units of the inventory are physically present at any given time. Dealers are required to file an annual heavy-equipment *584 inventory form promulgated by the comptroller, which must contain: (1) "the name and business address of each location at which the declarant conducts business" (not each location where a unit of heavy equipment was located on January 1); (2) "a statement that the declarant is the owner of a dealer's heavy equipment inventory"; and (3) "the market value of the declarant's heavy equipment inventory for the current tax year as computed under Subsection (b)." Id. § 23.1241(f). Then the dealer must file with "the collector" monthly heavy-equipment inventory tax statements indicating the "unit property tax" of all items sold or leased the preceding month and, "together with the statement," must "deposit with the collector an amount equal to the total of unit property tax assigned to all items of heavy equipment sold, leased, or rented from the dealer's heavy equipment inventory in the preceding month to which a unit property tax was assigned." Id. § 23.1242(b) (emphasis added). Those funds are held in escrow. Id. § 23.1242(c). At the end of the year, after tax rates are finalized, the taxing unit prepares the annual tax bill, toward which prepayments held in escrow are applied. See id. § 23.1242(h). This tax-prepayment system centers on the "unit property tax," which is calculated by multiplying the payments received for each unit by the "unit property tax factor," calculated as the "tax rate at the location where a dealer's heavy equipment inventory is located on January 1"-not the different tax rates at the various locations where each individual unit of the dealer's inventory is located on January 1. Id. § 23.1242(a)(4) (emphasis added).
The county's position would require EXLP to initiate this process in every county in which any piece of its leased equipment is located long enough to be taxed under section 21.02. But the procedure explained above is incompatible with that approach-it plainly calls for prepayments based on the monthly revenue generated by a dealer's entire inventory, regardless of the physical location of individual units. Under section 21.02, however, physical location is nearly all that matters.
It necessarily follows that those prepayments-and the dealer's ultimate tax liability-can be made and incurred in only one county. Otherwise, dealers would face double or greater taxation when paying taxes on an entire inventory in every county where a unit of property is located. And application of the default situs provision would lead to exactly that result. Because it considers the location of individual units of inventory rather than the revenue generated by the inventory as a whole, dealers would be subject to taxation in each county where a unit of their inventory was located "on January 1 for more than a temporary period." See id. § 21.02(a)(1). This piecemeal approach to valuing and taxing heavy-equipment inventories is inconsistent with the comprehensive methodology contained in sections 23.1241 and 23.1242, which look to inventory-wide revenue regardless of location.
A county seeking to tax only EXLP's compressors in its jurisdiction faces a statutory impossibility: it must rely on section 21.02 to establish taxable situs within its jurisdiction but cannot apply the exclusive procedure for taxing dealer-owned heavy equipment without valuing and taxing the dealer's entire inventory. If a county seeks to tax discrete units in its jurisdiction under section 21.02, it must ignore sections 23.1241 and 23.1242 altogether. And Galveston County chose exactly this when it effectively decided to ignore the legislature's 2012 tax-code amendments and continue taxing EXLP's compressors in its jurisdiction based on their full market value.
*585 Conversely, a dealer could not pay taxes on individual units of leased equipment to the counties in which the equipment resides on January 1 and simultaneously follow the process for valuing and making prepayments on its entire inventory as mandated by sections 23.1241 and 23.1242. If a dealer were required to pay taxes on, say, one compressor located in any given county to that county, the procedure specified in sections 23.1241 and 23.1242 would require the dealer to file a declaration of its entire inventory in that county and make monthly tax prepayments based on the revenue produced by that inventory.[4] This is obviously not a process that can be followed more than once, in a single county, every tax year. It would be neither sensible nor workable to send prepayments and monthly statements to each of the various counties in which a unit is located-which may not always be possible when dealers do not know where leased equipment is at all times-rather than to a single county where a dealer's entire inventory is based.
We hold section 21.02 does not control the taxable situs of property covered by section 23.1242. Although section 21.02(a) does not include an exception to its applicability for leased heavy-equipment inventory, it nonetheless cannot be applied while giving effect to the valuation and prepayment framework created by sections 23.1241 and 23.1242. But both statutes can be given full effect if section 21.02(a) is seen for what it is-a default rule determining taxable situs for tangible personal property generally-and if sections 23.1241 and 23.1242 are read to create a comprehensive statutory scheme containing its own taxable-situs rules.
The county sought summary judgment that, based on section 21.02, Galveston County is the taxable situs of EXLP's compressors located there. It makes no alternative argument that, pursuant to sections 23.1241 and 23.1242, EXLP was obligated to file a declaration of its inventory in Galveston County, see id. § 23.1241(f), pre-pay taxes on that inventory, see id. § 23.1242(b), and ultimately be liable to Galveston County for the taxable value of its inventory, see id. § 23.1242(b). We are left with no basis to conclude, as a matter of law, that Galveston County is the taxable situs for EXLP's inventory or for any units located in Galveston County.
The question, then, is whether EXLP should have been granted summary judgment that its compressors located in Galveston County are properly taxable in Washington County. Sections 23.1241 and 23.1242 are clear that taxes should be paid based on inventory-wide revenue, and EXLP argues it should make payment in the county where it "conducts business." According to affidavit testimony from an EXLP regional vice president, the compressors located in Galveston County are part of EXLP's "Gulf Coast Region fleet." As such, they are "assigned" to EXLP's "business location and storage yard in Washington County," which is used to "manage the inventory of compressors in the Gulf Coast region." At this location, EXLP "maintains offices open to the public, stores the equipment in the yard when *586 not in use, services and repairs the equipment, stores and sells replacement parts, maintains its records, coordinates its field service and logistics, and employs service personnel." So although individual units of EXLP's inventory may be anywhere on January 1, its inventory is based and maintained in Washington County.
Importantly, Galveston County does not argue Washington County should not be EXLP's taxable situs if the statutory framework described above is accepted. It did not present controverting evidence that EXLP's Washington County yard is not where the leased compressors located in Galveston County are maintained, serviced, and overseen. But EXLP offered summary-judgment evidence that its Washington County business location is such a facility-the compressors at issue here are "assigned to" the Washington County storage yard, which "manages the inventory of compressors in the Gulf Coast region." We conclude EXLP met its summary-judgment burden to conclusively establish Washington County as the proper taxable situs for its inventory.
* * *
The county goes to great lengths to argue the impropriety of both the valuation scheme and situs implications found in 23.1241 and 23.1242. It paints a dire picture of lost tax revenue. And it insists the compressors at issue are massive installations that remain fixed in place for years and should not be treated the same as a truly transitory inventory of bulldozers or backhoes. But even if this were all true, it does not cure our inability to pass judgment on the wisdom of the legislature's chosen tax policies.
The legislature is "free to adopt the mode of ascertaining the value of any class of property by such method as it might deem best," Shannon , 100 S.W. at 144, and its statutory scheme sets situs in the county where the dealer does business. If the legislature's chosen taxation scheme produces undesirable results unforeseen by the legislature, the remedy lies in modifying the law through the legislative process. We reverse the court of appeals and render judgment against Galveston County on both issues.
Justice Guzman did not participate in the decision.

The county did not contest the trial court's declaration that the compressors are "heavy equipment" under tax code section 23.1241(a)(6).

The county also argues the classification here violates the equal-and-uniform provision-an argument we address later.

The court of appeals treated the county's argument as the county labeled it-an as-applied constitutional challenge. But the claim here is facial; it attacks every application of the statute because the statute clearly does not even attempt to approximate market value under any set of circumstances. The county reveals its true position on the statute by its decision to categorically refuse to apply it as to all dealers doing business in its jurisdiction.

Under section 23.1242(b), monthly prepayments must consist of "the total of unit property tax assigned to all items of heavy equipment sold, leased, or rented from the dealer's heavy equipment inventory in the preceding month." Pursuant to that subsection, this "unit property tax" is determined by multiplying the sales price or rental payment received for each unit by the "unit property tax factor," which, under section 23.1242(a)(4), is calculated based on the preceding year's ad valorem tax rate "at the location where a dealer's heavy equipment inventory"-not each individual unit-is located on January 1 of the current tax year.